554 F.2d 1353
 20 Fair Empl.Prac.Cas. 1298, 14 Empl. Prac.
Dec. P 7669
Mildred HARKLESS et al., Plaintiffs-Appellants,
v.
The SWEENY INDEPENDENT SCHOOL DISTRICT OF SWEENY, TEXAS, and
Fred Miller, Superintendent, et al., Defendants-Appellees.
 No. 75-1533.
 United States Court of Appeals,
Fifth Circuit.
 July 1, 1977.
Rehearing Denied July 26, 1977.
 
 Weldon S. Berry, Houston, Tex., Sandford D. Bishop, Jr., Columbus Ga., Jack Greenberg, James C. Gray, Jr., New York City, A. J. Cooper, Jr., Prichard, Ala., for plaintiffs-appellants.
 Grant Cook, Houston, Tex., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Texas.
 Before AINSWORTH and CLARK, Circuit Judges, and HUGHES, District Judge.*
 HUGHES, District Judge:
 Plaintiffs in this action are ten[1] black school teachers whose 1965-66 teaching contracts with the Sweeny Independent School District (S.I.S.D.) were not renewed for the 1966-67 school year. On May 23, 1966, they and two others who later withdrew from the suit filed an action against the S.I.S.D., its superintendent, and seven members of the school board. The superintendent and school board members were sued in both their official and individual capacities, but later, during the original trial, plaintiffs dropped their claim against these people in their individual capacities. Asserting 42 U.S.C. § 1983[2] and 28 U.S.C. § 1343(3)[3] as the jurisdictional basis, plaintiffs claimed they had been discharged because of their race and sought reinstatement and back pay. A jury returned a verdict for defendants on, among other things, the issue of whether the defendants had not renewed the teaching contracts because of plaintiffs' race. After this verdict, the trial court dismissed plaintiffs' complaint, concluding that the school district and the defendants in their official capacities were not "persons" within the meaning of § 1983. On appeal, this Circuit reversed the district court, holding that it had erred in granting defendants a jury trial and in finding the defendants not to be § 1983 persons. Harkless v. Sweeney Independent School District, 427 F.2d 319 (5th Cir. 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971).
 About two years later, after testimony had been presented to supplement the transcript of the earlier trial, the district court took the case under consideration. A year later, while the case was still under consideration, the Supreme Court decided City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), which held that a municipality is not a person under § 1983 for purposes of equitable relief. The tandem of Kenosha and Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which had held that a municipality was not a § 1983 person where damages are sought, meant that a municipality could not be sued under § 1983. In its wake, Kenosha left questions about jurisdictional matters in this case.
 After the Kenosha decision, there was a five month hiatus which ended with the district court requesting briefs on the applicability and reach of Kenosha. In response, in addition to the parties' briefs on Kenosha's impact, plaintiffs filed a Motion for Leave to Amend Second Amended Complaint primarily aimed at avoiding the possible jurisdictional problems presented by Kenosha. Another year elapsed and, on January 10, 1975, the district court issued its Memorandum Opinion and Order, which included a denial of the motion to amend, and entered Final Judgment denying all relief sought by plaintiffs. This appeal followed.
 Before this court, plaintiffs argue that the district court erred in two basic respects. First, they assert error in the district court's finding that they were not discharged because of their race. Second, they assert error in the district court's holding that it could only grant prospective injunctive relief in the form of reinstatement against the individual defendants in their official capacities, assuming plaintiffs' success on the merits. As subsidiary issues to the second asserted error, plaintiffs argue that their Motion for Leave to Amend Second Amended Complaint should have been granted and that the district court could have granted full relief in the form of reinstatement and back pay plus allowances for a successfully urged cause of action. We reverse on all issues except the district court's denial of that portion of the motion to amend relating to the rejoining of the individual defendants in their individual capacities.
 Until the 1965-66 school year, S.I.S.D. was a dual school system with both the students and faculties segregated along racial lines. All black students of whatever grade and all black faculty were assigned to the George Washington Carver School (Carver) which had no white students or teachers. For the 1965-66 school year, the school district instituted a freedom of choice system for the students while continuing to assign all its black teachers to Carver. Then, in 1966-67, the district desegregated its faculty as well as its student body.
 The important events in this case occurred in the 1965-66 school year. In that year, Carver had twenty four teachers, all black, and a principal who also was black. At the request of the district superintendent and in preparation for the coming faculty desegregation, a staff requirements study was prepared. It indicated that twelve fewer teaching positions were needed for the next school year.
 In February, 1966, the superintendent requested the district's curriculum director to prepare an evaluation of Carver's teachers. No such evaluation was requested for the district's white teachers. The completed evaluation was submitted in anecdotal form and was laden with remarks that were what the trial court termed "not models of diplomatic composition". A stronger appellation might be given, despite the trial court's finding them not to be insulting, but a sampling of the remarks is the best way to give their true flavor. Cleo Grimes was described as having ". . . honest and realistic aspirations for her race." Margaret Gee was said to have "seen much more of the world than most; displays relatively racial and provincial facets." John P. Jones was termed "(a) real up-town, gold-toothed, yellow shod dude." Hilbert Simien was said to be "(r)easonably cultured by our standards . . ." There were numerous other references to race in a similar vein.
 Sometime during February or March of 1966, the Carver faculty again was singled out for a separate evaluative process. At the superintendent's behest, the curriculum director and the Carver principal numerically ranked the Carver teachers against one another according to supposed competence. The superintendent also performed this ranking and then compiled the three ratings on a "Teacher Evaluation Worksheet". The twenty three permanent teachers are listed and next to their names are three columns of numbers which are the individual rankings by the superintendent, the curriculum director, and Carver's principal. The sums of these three rankings for each teacher are in another column. Next to this column but adjacent only to the eight teachers with the lowest cumulative rankings are the numbers 1 through 7. (Two teachers tied in their cumulative rankings and, thus, both have a 7 by their names.)
 A slight detour is necessary to highlight the significance of the numbers 1 through 7 appearing on the worksheet. Only seven black teachers received teaching contracts for the 1966-67 school year. Five were those teachers with the numbers 1 through 5 next to their names. The other two were the Carver principal, who was demoted to teacher, and his wife. The school district refused to renew the contracts for seventeen (about 70%) of the twenty four Carver teachers. Every white teacher who wanted to continue teaching had his or her contract renewed. Additionally, seventeen new teachers were hired for the 1966-67 school year. All were white.
 Returning to the main road, on March 1, 1966, the superintendent sent a memorandum to the principals of the S.I.S.D. schools requesting them to submit by March 7, 1966, two evaluations of the teachers in their respective schools. One evaluation was by means of a Steck Form.[4] A Steck Form is a document on which an evaluator rates a teacher according to thirty eight characteristics which cover the areas of personal qualities, teaching abilities, routine and physical conditions, discipline, cooperation, professional growth, and social efficiency. Ratings for each characteristic are to be on a five point scale ranging from "excellent" to "unsatisfactory". The other evaluation was to be made by means of a notation on the Steck Form. The notation (or overall rating) was to be a number from 2 through 10. The higher the number, the better the teacher. No correlation between the Steck Form evaluation and the overall rating was required or discussed. Though the superintendent and curriculum director did not prepare Steck Forms, they did make overall ratings of the district's teachers. Under this two step process, each of the plaintiffs ranked lowest among his or her grade/subject matter group.[5]
 The process's culmination was reached on March 8 when, one day after the due date for the Steck Forms and overall ratings, the S.I.S.D. School Board accepted the superintendent's recommendations to rehire 100% of the white teachers and only 30% of the black teachers.
 The employment decisions purportedly were based on the results of the Steck Form evaluations and overall ratings, themselves contested, in which teacher comparisons were made on a district wide basis. The district court found the foregoing as fact. With the benefit of guidance from a recent Supreme Court decision, we reject such a finding as clearly erroneous, to the extent that it is a true finding of fact at all.[6]
 The Supreme Court decision is Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and the guidance it provides is in our inquiry into whether there was intentional racial discrimination in this case. We find that there was. In Arlington Heights the Supreme Court held that "(p)roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 265, 97 S.Ct. at 563, 50 L.Ed.2d at 464. See also Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). It is true that Arlington Heights differed from this case in certain respects. In Arlington Heights a statute neutral on its face was under attack. Here, an administrative action purportedly racially neutral is involved. Arlington Heights dealt with the fourteenth amendment's equal protection clause. This case deals with statutes enacted under the enforcement provisions of the thirteenth amendment as well as the fourteenth amendment. Nonetheless, Arlington Heights provides useful guidelines for determining the mental state accompanying a decision alleged to be intentionally discriminatory such as the decision not to retain these plaintiffs. A list, acknowledged to be incomplete, of six standards for guiding "a sensitive inquiry into such circumstantial and direct evidence as may be available" is provided in the Arlington Heights opinion. The standards are: (1) the impact of official action, though this is usually not determinative; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) the legislative or administrative history. 429 U.S. at 266-267, 97 S.Ct. at 564-565, 50 L.Ed.2d at 465-66.
 Measuring the facts of this case against these standards, we see that the dismissal of plaintiffs was an intentional act of racial discrimination. The impact of the action is particularly devastating. To recapitulate, of the black teachers, 70% did not have their contracts renewed. Every white teacher so desiring was rehired. Additionally, 100% of the seventeen newly hired teachers were white. No small mental effort is required to move beyond this to a consideration of the other guides to a determination of intent, but these other guides must be considered.
 The historical background further batters the "buckler and shield", Horton v. United States Steel Corp., 286 F.2d 710 (5th Cir. 1966), with which the trial court's fact findings come armed. The S. I. S. D. historically was a dual school system and, though its desegregation efforts were not undertaken pursuant to a court order, no segregated school district after Brown v. Board of Education escaped some external pressures toward desegregation. Overnight changes in racial attitudes, as we have sadly noted in the last twenty years, are rare. There is little indication that the S. I. S. D. as an institutional whole attained that rarity.
 The last four factors set out in Arlington Heights are difficult to disentangle and can be considered together here under the general rubric of "sequence of events". The anecdotal evaluation with its disparaging racial comments and its sole focus upon black teachers was performed by one of the key actors in the employment decision, the curriculum director, for another key actor, the superintendent. The superintendent's proffered explanation was that the anecdotal evaluation was to familiarize him with Carver teachers about whom he admittedly knew little, so that he could defend his ultimate decision on black teachers' employment against anticipated community attacks. Furthermore, the superintendent said that the anecdotal evaluation was not used in arriving at his March 8 employment recommendations. This diminution of the anecdotal evaluation's importance was accepted by the trial court.
 The superintendent's position is undercut by two considerations. First, the superintendent seemingly entertained contradictory views on his familiarity with the Carver teachers. Part of his justification for the anecdotal evaluation was his lack of familiarity with the school system's black teachers. Yet, this same superintendent participated in the overall rating of the Carver teachers and presumed to know so much more about their competency that he consistently rated them much lower than the Carver principal did. Second, the superintendent must have assumed that retention of black teachers would require greater justification than the retention of white teachers. Otherwise, why separately evaluate only the black teachers? In light of Arlington Heights we find the anecdotal evaluation and the manner in which it was done strongly probative, though circumstantial, evidence of the intent behind the employment decisions.
 Consideration of other events in the sequence leading to the employment decision brings into full relief the discriminatory intent present in this case. The black teachers were the only teachers ranked against one another. Nothing similar was done in any of the schools with all white faculties. Atop this damaging fact sits another one even more damaging to defendants. After this intra-Carver comparison, the teachers were not ranked from 1 through 23. Instead, only eight were ranked by number. Subsequently, six of these eight, along with the demoted Carver principal, were rehired. The most logical conclusion is that the decision had been made to retain seven and only seven black teachers. Reinforcing this conclusion is the fact that seventeen black teachers were not retained despite the staff requirements study's conclusion that only twelve fewer teachers were needed the following year after faculty desegregation. Of course, the reality is that only four, not twelve, fewer positions existed the next year. Thus, seventeen teachers who had been deemed competent enough for reemployment for several years in the past were discharged when, in fact, only 25% of them would have lost employment due to staff cutbacks after faculty desegregation, assuming they were indeed the least qualified of all the teachers. In this area, one last fact leaves the trial court's findings of fact on the true decisionmaking process defenseless, without the "buckler and shield". All seventeen of the newly hired teachers were white. In effect, they replaced the discharged black teachers.
 We hold that the district court, which reached its decision before Arlington Heights was handed down, was clearly in error in finding that no intentional racial discrimination occurred in the non-renewal of plaintiffs' teaching contracts and in finding that the Steck Form/overall rating process was the method actually used to evaluate the teachers to arrive at the employment decision on March 8. There was intentional racial discrimination in the non-renewal of the contracts. Given this result and its basis, we need not consider in any greater detail the validity of an evaluation process which uses the Steck Form/overall rating method. Here, such a process was only a pretext for denying plaintiffs their jobs on the basis of race.
 We now turn to a consideration of the issue of what relief can be granted for the unconstitutional refusal to renew plaintiffs' teaching contracts on the basis of their race. Related issues involve questions of jurisdiction and the propriety of plaintiffs amending their pleadings to allege new jurisdictional grounds, new statutory causes of action, and to rejoin the individual defendants as defendants in their non-official capacities.
 In their original Complaint, filed on May 23, 1966, plaintiffs prayed for reinstatement and back pay and allowances. (Since allowances are part of any recoverable back pay, the term "back pay" will be used to describe the whole package of retroactive monetary relief.) Throughout the next eleven years, they have sought the same relief from the same defendants, with one exception. That exception is that during the original trial before a jury plaintiffs dropped their claims against the individual defendants in their individual capacities. In that original complaint and in two subsequent amended complaints, plaintiffs asserted a cause of action under § 1983 and jurisdiction under § 1343(3). No other statutes were asserted as applicable to these proceedings. Understandably, the impact of Kenosha and its Fifth Circuit progeny[7] was unforeseen.
 After Kenosha plaintiffs filed a Motion for Leave to Amend Second Amended Complaint. They sought to assert jurisdiction under 28 U.S.C. §§ 1331 and 1343(4) and to include additional causes of action under 42 U.S.C. §§ 1981, 1985, and 1988. Also, they sought to rejoin the individual defendants as defendants in their individual capacities. The motion was denied in its entirety.
 At oral argument, plaintiffs' counsel agreed that, if the amendment relating to § 1981[8] and its jurisdictional counterpart § 1343(4)[9] was allowed, consideration of the amendment relating to § 1331 was unnecessary from his point of view. The portions of the motion to amend relating §§ 1985 and 1988 were not urged at oral argument. Given our disposition of the issue, we pretermit discussion of matters pertaining to §§ 1331, 1985, and 1988.
 Amending the pleadings to add allegations of a cause of action under § 1981 and jurisdiction under § 1343(4) is important only insofar as available relief is concerned. No new facts would be alleged. The only impact of such an amendment would be in the area of back pay since, for purposes of reinstatement, these individual defendants in their official capacities are § 1983 persons. Plaintiffs' case having been proven on the merits, reinstatement under a § 1983 cause of action against the individual defendants in their official capacities is available. This issue was settled in Campbell v. Gadsden County District School Board, 534 F.2d 650 (5th Cir. 1976). Gadsden likewise said that § 1981 was available as a cause of action to remedy employment discrimination and that back pay was an appropriate part of the remedy for a proven case of discrimination, such as this one. Definitional problems with "person" are absent from a § 1981 action.
 The difference between Gadsden and this case is that the plaintiffs in Gadsden had asserted both § 1983 and § 1981 causes of action in pleadings before the district court. In this case plaintiffs unsuccessfully sought to add a § 1981 cause of action to their pleadings before the district court. Therefore, our task on this appeal is to determine whether amended pleadings are required. Since motions to amend pleadings are addressed to the sound discretion of the trial court, see, e. g., Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) and Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the task resolves itself into the question of whether the trial court abused its discretion in denying this portion of the motion to amend.
 Leave to amend pleadings "shall be freely given when justice so requires." F.R.C.P. 15(a). Furthermore, the motion to amend by adding § 1981 as a cause of action and § 1343(4) as a jurisdictional basis, without adding new factual allegations, is fundamentally a motion to amend to correct a defective allegation of jurisdiction. That is because, in this situation, the statutory cause of action and its jurisdictional counterpart are merely two sides of the same coin. Given this, 28 U.S.C. § 1653 is applicable. This statute reads: "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." It is to be liberally construed. McGovern v. American Airlines, Inc., 511 F.2d 653 (5th Cir. 1975).
 For eleven years plaintiffs, alleging the same facts, have sought the same relief from the same defendants. The requested amendments add nothing substantively new to their claim, though, their claim proven, a new form of relief one thought to be available under § 1983 at the filing of the original complaint becomes appropriate.
 We hold that the trial court's discretion was abused when it refused to grant the portion of the motion to amend relating to §§ 1981 and 1343(4). The facts of this case, the sort of amendment requested, Rule 15(a), and § 1653 left the trial court with no discretion to deny the requested amendment.
 We add that adding § 1981 as a statutory cause of action presents no problem concerning whether the statute of limitations might have run on the § 1981 action. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), contrary to defendants' position, is not applicable to this case. Federal Rule of Civil Procedure 15(c) is. In pertinent part it reads: "Whenever the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading, the amendment relates back to the date of the original pleading." "The purpose of (Rule 15(c)) is accomplished if the initial complaint gives the defendant fair notice that litigation is arising out of a specific factual situation." Longbottom v. Swaby, 397 F.2d 45, 48 (5th Cir. 1968). Such is precisely the situation here. The complaint was filed just over three months after the complained of action. No statutory limitation period had run.
 The district judge also denied the portion of the Motion for Leave to Amend Second Amended Complaint seeking to rejoin as defendants in their non-official capacities the individual defendants. In the original trial before a jury, plaintiffs' counsel had approached the Bench and said: "We would like to withdraw our prayer for relief against the school board members individually." Trial Transcript 72. Later, plaintiffs' counsel told the court: "The claim for damages against the trustee defendants having been withdrawn, then they are only sued in their official capacities . . ." Trial Transcript 1315. These statements along with other references during the trial left in some confusion the issue of whether the dismissal was with or without prejudice. The trial court resolved this murky issue against the plaintiffs presumably to avoid the possibility that by rejoining defendants already voluntarily dismissed, arguably with prejudice, allowance of the amendment would cause defendants "undue prejudice". Foman v. Davis, supra, 371 U.S. at 182, 83 S.Ct. 227. The trial court did not abuse its discretion in denying this portion of the motion to amend.
 This cause is now remanded to the trial court with directions to grant the Motion for Leave to Amend Second Amended Complaint in a manner consistent with this opinion, to enter judgment for plaintiffs in a manner consistent with this opinion, and for further proceedings not inconsistent with this opinion, including proceedings concerning the amount of back pay owed to plaintiffs and reasonable attorneys' fees.
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 
 *
 Senior District Judge of the Northern District of Texas sitting by designation
 
 
 [1]
 At oral argument, plaintiffs' counsel informed the Court that Velma Shelby, one of the ten, is deceased
 
 
 [2]
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
 
 
 [3]
 "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . (t)o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States(.)"
 
 
 [4]
 Due to illness, the principal of the all white elementary school prepared no Steck Forms. The evaluations from the previous year were used instead
 
 
 [5]
 One of plaintiffs, Florence Jones, was not evaluated because she was a substitute teacher without a contract
 
 
 [6]
 Since the finding is clearly erroneous, we need not discuss its characterization as either a "true" fact or an "ultimate" fact, the latter being a question of law
 
 
 [7]
 See, e. g., Sterzing v. Fort Bend Independent School District, 496 F.2d 92 (5th Cir. 1974); Adkins v. Duval County School Board, 511 F.2d 690 (5th Cir. 1975); Vick v. Texas Employment Commission, 514 F.2d 734 (5th Cir. 1975); and Muzquiz v. City of San Antonio, 520 F.2d 993 (5th Cir. 1975), aff'd. on rehearing en banc, 528 F.2d 499 (1976), U.S. appeal pending. The Supreme Court has pending a case, Monell v. Department of Social Services, 532 F.2d 259 (2d Cir. 1976), cert. granted, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977), which should provide further guidance on what a § 1983 "person" is
 
 
 [8]
 "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."
 
 
 [9]
 "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . (t)o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."