**UNITED STATES of America**
**Abbie Lorene Holley, Intervenor,**

v.

**RICHARDSON INDEPENDENT**
**SCHOOL DISTRICT.**

**Civ. A. No. 3–4101–C.**

United States District Court,
N. D. Texas,
Dallas Division.

Dec. 28, 1979.

Kenneth J. Mighell, U. S. Atty., Dallas, Tex., for plaintiff.

Jay Fichtner, Berman, Fichtner & Mitchell, Dallas, Tex., for intervenor.

Henry D. Akin, Jr., Dallas, Tex., for defendant.

MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

Abbie Lorene Holley (hereinafter called Intervenor) filed her motion for leave to intervene in this case on August 30, 1976. On March 2, 1977, this Court entered an order allowing intervention limited to the question of Intervenor's allegedly improper dismissal from the Richardson Independent School District (hereinafter called RISD). Intervenor alleged that the RISD had violated this Court's orders in terminating her contract of employment and Intervenor also claimed that the RISD had violated her constitutional rights of due process and equal protection of law under the Fourteenth Amendment to the United States Constitution.

The RISD is a school district with a past history of segregated schools, and has been ordered by this Court to convert from a dual to a unitary school system. The RISD is operating under a Desegregation Order entered on September 10, 1970, by this Court. Since that time, this Court has ex-ercised continuing jurisdiction of this case and receives periodic reports from the School District as to progress in the attainment of a unitary system.

Although the United States is a party to this action and Intervenor's claims were investigated by an attorney from the Education Section of the United States Department of Justice, the Assistant United States Attorney chose not to participate in the trial of Intervenor's suit.

I. *Factual Background*

Prior to August, 1976, Intervenor had been employed as a teacher in the Richardson Independent School District for fifteen years, during the last six of which Intervenor was assigned to Stults Road Elementary School. For the seven years preceding 1976, Intervenor was continuously employed as a fifth grade teacher. During each year of her employment Intervenor was evaluated as to her competency in various classifications of job performance, some of which reflect above average but none of which reflects a rating below "satisfactory." (Intervenor's Exhibits 11, 12, 13, 14, 15, 16 and 18.) Intervenor's "Evaluation of Competency in Job Performance" for the school year 1975–1976, which was attested by Otis Ratliff, the principal of Stults Road Elementary School at the time of her termination, reflects "satisfactory" performance in "discipline and behavior" of pupils, among other areas.

Between 1961 and 1970 Intervenor taught at Hamilton Park Elementary School, which was an all-black school. From 1968 to the date of her termination, Intervenor had been employed by the RISD under a "continuing contract" as defined in Chapter XIII, Sub-Chapter C of the Texas Education Code. From 1970 until her termination on August 16, 1976, Intervenor was the only black teacher at the Stults Road Elementary School. After her termination Intervenor was replaced by a white teacher, Mrs. Jo Thurman, at Stults Road Elementary School. At the time of trial there were no black teachers at Stults Road Elementary School. Intervenor has a Master's Degree

in Elementary Education and is certified in Special Education for the Mentally Retarded, Educable and Trainable. Prior to the date of her termination, Intervenor's "continuing contract" of employment with the School District had been renewed for the 1976–1977 school year.

According to Otis Ratliff, principal of Stults Road Elementary School, the dismissal of Intervenor from the RISD was based solely on an incident which occurred at Stults Road Elementary School on May 27, 1976, the last day of the school year. Prior to that time the RISD had received no complaints concerning Intervenor's discipline of students. At approximately 11:20 a. m. on May 27, 1976, while her full class was engaged in a physical education class, Intervenor was in her empty classroom administering a test to one of her fifth grade students, Scott Murnan. At that time, Seth Dewit, a sixth grade student, was in the hallway, cleaning out his locker. Seth had heard that Intervenor had a piñata full of candy that was going to be broken and Seth went by to ask Intervenor if he could get some of the candy. Seth entered Intervenor's classroom without Intervenor's permission and without the permission of his own teacher, Mrs. Love.

All sides in this action agree that Seth did not respond appropriately to Intervenor's order that he leave her classroom. Seth had his arm through the straps of a cassette recorder and had it up to his ear. According to Seth, the cassette player was playing so loudly that he had "trouble hearing" what Intervenor was saying. (Defendant's Exhibit 8.) Seth was saying things and disturbing Intervenor's student who was taking his final exam at that time. Intervenor asked Seth to leave and he would not. There were two other boys at the door and they also were commenting that the classroom was school property and that they didn't have to leave. At that point Intervenor got up from her desk and grabbed Seth by the arm and moved him to the door. Although there is some variation in the testimony it is clear that Seth Dewit was quite aggressive towards Intervenor by his language and actions. Seth stood in the doorway and attempted to hold the door open while Intervenor tried to close it.

According to testimony by Intervenor, she struck Seth Dewit on the shoulder with her hand while they were both inside the classroom. At this point in the confrontation Seth testified that he told Intervenor, "Don't hit me or I'll sue you." Apparently at this time Intervenor was half in and half out of the classroom and wanted to close the door. Intervenor asked Henry Morales, one of the boys with Seth, to go get Seth Dewit's teacher. Henry Morales did leave, but could not find a teacher. Apparently at this point Seth's foot was blocking the door, and Intervenor was struggling with him to get it closed. Intervenor testified that Seth raised the recorder to hit her with it and that she struck Seth with her hand, defensively. Intervenor also testified that several of Seth's friends joined him outside the door and that she felt threatened by them.

At this point Intervenor struck Seth two or three times. Dub Edwards, one of the boys with Seth, stated that he tried to help Seth and "sort of blocked" the last hit and that Intervenor "sort of brushed his arm." Seth tried to protect himself with his hands, but a ring Intervenor had on her finger cut Seth somewhat on the back of the head.

According to Intervenor, she felt threatened, and when neither Mrs. Love, Seth's teacher, nor anyone else, came to her rescue, she felt that she was left to her own abilities to cope with Seth and the two other boys who were harassing her. Intervenor contends that her contact with Seth was an act of self-defense, after having been threatened, taunted, challenged and verbally abused. Intervenor alleges there was no thought or effort at punishment, but rather that her contact with him was for the peace and protection of her classroom space, so that her student could complete his final examination. It is clear that at least three boys were being quite aggressive to Intervenor, and that in response, while in the doorway, Intervenor struck Seth, either two or three times. At that point, the students involved and Intervenor

went to the principal's office to await Otis Ratliff's return. Upon his return, Mr. Ratliff first conferred privately with Seth Dewit, though Intervenor had asked to be present, and then Mr. Ratliff dismissed Seth and talked to Intervenor about the incident. Mr. Ratliff took notes of his conversation with Intervenor and asked her to sign his handwritten notes, which she did. Mr. Ratliff took notes of his conversation with Dewit, Murnan, and two other students, Henry Morales and Dub Edwards, who claimed to have been witnesses; he did not request that they sign his notes.

Seth Dewit took part in all of the field day activities scheduled for that last day of school, and was not seriously injured. He did have a small bruise on the back of his head that came from Intervenor's action of striking him with her hand.

On the afternoon of May 27th, Mr. Ratliff personally conferred with Seth's father, Michael Dewit, who did not complain about Intervenor's physical contact with his son, and did not register charges against Intervenor either with Mr. Ratliff or any other members of the administration. On the contrary, when Seth arrived at home on May 27th, he was punished by his parents for his conduct towards Intervenor. Seth Dewit's parents were neutral throughout all of the proceedings in this case.

Mr. Ratliff called John Roberts, Assistant Superintendent, that afternoon to discuss the incident and the alternatives, including Intervenor's termination. On May 28, 1976, the day following the confrontation, Mr. Ratliff asked for Intervenor's resignation, but she refused.

On Sunday, May 30, 1976, Intervenor visited Mr. and Mrs. Dewit at their home and apologized for striking their son, at which point Mr. and Mrs. Dewit assured Intervenor that they understood and told her he regularly rebelled against authority.

On June 7, 1976, Intervenor was sent a written notice that the RISD Board of Trustees intended to terminate her contract of employment at the next regular meeting of the Board, based on her "failure to comply with official directives and established school board policies." [1]

On August 3, 1976, the fact finding committee appointed by the Superintendent held a hearing on the termination appeal of Intervenor. Intervenor was represented by counsel and Otis Ratliff appeared to testify as to the evidence he had collected concerning the incident. On August 16, 1976, the Board of Trustees had an open meeting on Intervenor's appeal where Mr. Ratliff and Intervenor along with counsel were present. After listening to argument and the testimony of Mr. Ratliff and Intervenor, the Board of Trustees affirmed the termination of Intervenor's continuing contract and denied her appeal.

On August 24, 1976, the Board of Trustees informed Intervenor in writing (Defendant's Exhibit 7) that her continuing contract was terminated. The Board of Trustees determined that Intervenor's striking Seth Dewit was "not an action of self-defense but one of corporal punishment administered to Seth Dewit." In addition the Board determined that Intervenor by this act had violated Board Policy B–5131, dealing with the administration of corporal punishment in the School District. The Board terminated Intervenor's contract effective at the end of the 1975–1976 school year by virtue of V.T.C.A., Education Code Section 13.107(4), (1969), and by reason of the alleged violation of the Board's policy under V.T.C.A. Education Code section 13.-110(7), (1969).

At trial evidence was introduced that Seth Dewit had a police record as a result of vandalizing Stults Road Elementary School on June 30, 1975, which resulted in approximately $2,100.00 worth of damage to the school. Intervenor had been Seth Dewit's teacher while Seth was in the fifth

1. Clearly the Board Policy referred to is the following:

(Intervenor's Exhibit 31.) "Corporal punishment will be administered only as a last resort and only after notifying the parents or guardian. Corporal punishment shall be administered only in the presence of another teacher or the principal."

grade, and during that time Seth developed some deep resentment towards Intervenor because of some unfounded rumors of statements Intervenor allegedly made about Seth's brother. ·

Mr. Ratliff's decision to request Intervenor's termination was based only on that isolated event where she struck Seth, and he did not consider her fifteen year career of teaching in the RISD. Mr. Ratliff testified that he felt Intervenor had "flagrantly violated a School District policy" which no one was entitled to violate.

It is stipulated by all parties that if Intervenor's employment with the School District had continued, her annual compensation for the cited years would have been: 1976–1977—$13,880.00; 1977–1978—$15,120.00; and for 1978–1979—$15,820.00.

Immediately following her termination, Intervenor applied for teaching positions with other school districts, but all of her applications were denied because of her termination by the RISD. Following her termination, Intervenor applied for and received unemployment compensation through the Texas Employment Commission. The only employment which Intervenor had been able to obtain since her termination by the School District has been in menial, low-paying jobs. Since January 1, 1977, Intervenor has earned approximately $3,000.00 per year.

II. *Applicable Law*

Intervenor advances four arguments in support of reinstatement and back pay relief. The Court will discuss each argument, and finds that the equal protection and substantive due process theories do allow ·Intervenor to succeed on the merits of this case.

A. The first argument Intervenor advances is based on *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (en banc) (5th Cir. 1970). Under the holding in *Singleton*, any teacher "dismissed or demoted" as part of an overall reduction in staff resulting from court-ordered conversion to a unitary school system must be selected on the basis of "objective and reasonable nondiscriminatory standards."

Intervenor argues that Defendant's action in hiring a white fifth grade teacher at Stults Road Elementary School following Intervenor's dismissal was a violation of this Court's orders. Additionally, Intervenor argues that objective standards were required by the orders of this Court but were not used in her termination.

Intervenor alleges that the RISD did not have written Board policies which would directly cover the instant situation, and that the decision to dismiss Intervenor was based on the subjective assessments of Otis Ratliff. In addition Intervenor argues that the Board of Trustees affirmed Ratliff's action without independent investigation or use of objective standards. Intervenor argues that a dismissal made pursuant to a *Singleton* desegregation order simply cannot be sustained if non-racial objective criteria have not first been reduced to writing, made available for public inspection, and applied to the personnel action.

The Court finds that this argument lacks a threshold element. The Fifth Circuit in *Singleton* did not intend that these strict requirements in personnel actions apply in the absence of desegregation-related reductions. *Pickens v. Oklona Municipal Separate School District*, 527 F.2d 358, 361 (5th Cir. 1976). Intervenor's insistence notwithstanding, this Court cannot find any "desegregation-related reductions" occurred in the Richardson School System either immediately before or after Intervenor's termination.

Intervenor failed to produce evidence of a reduction in the number of principals, teachers, teacher-aides or other professional staff employed by Defendant as addressed by this Court's orders herein during any time pertinent to Intervenor's action. Having failed to make that threshold showing of a reduction upon which the subsequent requirements are dependent, Intervenor is not in a position to make claims of failure on Defendant's part to meet those requirements. Accordingly, the holding of *Singleton* is inapplicable.

■ B. Intervenor next argues that the RISD violated Intervenor's procedural rights of due process of law. The Court does not agree. Under the applicable law, RISD provided Intervenor with adequate procedural due process throughout all relevant proceedings. Intervenor was given adequate notice of the basis for the proposed termination of her contract prior to both the Fact Finding Committee meeting on August 3, 1976, and the Board of Trustees meeting on August 16, 1976. Intervenor had the opportunity to call any witnesses she wished to have present at the Fact Finding Committee meeting and the Board of Trustees meeting. Intervenor was represented by counsel at both the Fact Finding Committee and the Board of Trustees meetings and said counsel was allowed to present evidence in her behalf, to cross-examine the witness testifying against Intervenor, and to offer opening and closing statements.

At the request of Dr. J. J. Pearce, the Richardson Education Association selected members to serve on the Fact Finding Committee which was to hear presentations concerning the proposed termination of Intervenor's contract. Intervenor was informed as to the name of the witness who would present evidence against her and had been fairly apprised as to the nature of that evidence.

The Fact Finding Committee heard the testimony of Intervenor, Scott Murnan, Otis Ratliff, and the oral argument of counsel for Intervenor. Additionally, the Fact Finding Committee considered a written summary by counsel for Intervenor and a written statement by Otis Ratliff concerning the information given to him by persons (students and adults) having knowledge pertinent to the incident.

The Board of Trustees heard the testimony of Intervenor, the testimony of Otis Ratliff, and the oral argument of counsel for Intervenor; and the Board members posed questions to Intervenor and Otis Ratliff. Additionally, the Board of Trustees considered the written documents which had been presented to the Fact Finding Committee, the Fact Finding Committee's report, the transcript of the Fact Finding Committee meeting, Otis Ratliff's notes which he took while interviewing Intervenor on May 27, 1976, and which were signed by Intervenor, and Intervenor's personnel record.

The requisite elements of procedural due process are not wooden absolutes applicable to each case regardless of circumstances. The list of opportunities that Intervenor had to present her case goes beyond the minimum requirements of procedural due process usually imposed in termination actions. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Dixon v. Alabama State Board of Education,* 294 F.2d 150 (5th Cir. 1961); *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir. 1970).

■ Intervenor has argued that Defendant's failure to call a number of witnesses as requested by Intervenor violated her rights of due process. However, due process in this context does not place an affirmative burden on a school board to call and produce witnesses on behalf of the complaining individual but merely requires that the individual not be precluded from calling such witnesses and presenting his own evidence. Intervenor's production of her witnesses was in no way limited or impeded by the RISD in this case. The RISD complied with minimum requirements of procedural due process in the matter of the termination of Intervenor's contract of employment.

C. The Court will consider Intervenor's substantive due process argument in conjunction with her equal protection argument, because they both involve a substantive evaluation of the School District's actions.

The Court is mindful that since the early 1900's the federal judiciary has rejected a "freewheeling use of substantive due process" because it inevitably has led to an unwarranted invasion of the duties and responsibilities of state and local governments. *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

In the instant case, the Court has found that minimum procedural due process was accorded to Intervenor. However, even though the School Board has wide discretion in this context, discretion means the exercise of judgment, not bias or capriciousness. It must be based upon fact and supported by reasoned analysis. *Johnson v. Branch*, 364 F.2d 177 (1966); *Strickland v. Inlow*, 485 F.2d 186 (8th Cir. 1973). Furthermore, this power must not be exercised "in an arbitrary or discriminatory manner," nor in such a way as to impinge constitutional rights. *Konigsberg v. State Bar of California*, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957). Although the district court may not usurp the discretionary power of the School Board, it "must judge the constitutionality of its action on the basis of the facts which were before the board and on its logic." 364 F.2d 177 (1966). It is because of the fact that a School Board's discretion cannot be exercised in a discriminatory manner, that Intervenor's substantive due process claim relates directly to Intervenor's equal protection claim. The two separate contentions cannot be weighed in airtight compartments. *Johnson v. Branch*, 364 F.2d 177 (1966) at 182.

■ The Court finds that the School District intentionally discriminated against Intervenor in terminating her contract of employment based on racial considerations. Purposeful racial discrimination is perhaps the paradigm case of arbitrariness, tainting the deliberations even though the procedure used was adequate. The Court finds that the RISD violated Intervenor's right to substantive due process for reasons that are similar to those which are articulated in *Johnson v. Branch*, supra. Essentially, it is apparent that absent the racial question the termination issue would not have arisen under these facts. The only reasonable inference that can be drawn from the RISD's termination of Intervenor's contract of employment based on such an unusual, one-time event, and in the face of her completely unblemished fifteen year record with the RISD, and where the Board Policy allegedly violated was largely if not completely unenforced prior to this event, is that the School Board was being arbitrary and capricious.

D. Lastly, the Court will discuss Intervenor's equal protection claim.

The Court finds that Board Policy B–5131, which the Board of Trustees was allegedly enforcing in terminating Intervenor's contract of employment, is reasonable and neutral on its face. However, as Justice Douglas in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, stated, "What may be said of the validity of a law on the books and what may be done with the law in its application do, or may, lead to quite different conclusions." Longstanding law makes clear that "a statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race." *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metropolitan Housing Corporation*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Equal Protection Clause of the Fourteenth Amendment "require(s) judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups." *Furman v. Georgia*, supra, 408 U.S. at 256, 92 S.Ct. at 2735.

*Harkless v. Sweeny Independent School District*, 554 F.2d 1353 (5th Cir. 1977), cert. denied 484 U.S. 966, considered a supposedly neutral administrative action, as is the case at bar. The Fifth Circuit Court of Appeals found that *Arlington Heights*, supra, presented a set of "useful guidelines for determining the mental state accompanying a decision alleged to be intentionally discriminatory such as a decision not to retain these plaintiffs." *Harkless v. Sweeny I.S.D.*, supra, at 1356.

The Court in *Arlington Heights*, supra, provided a list of six standards for guiding "a sensitive inquiry into such circumstantial and direct evidence as may be available." The standards are: (1) the impact of official action, though this is usually not determinative, (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged deci-

sion; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) the legislative or administrative history. 429 U.S. at 266–267, 77 S.Ct. at 564–565, 48 L.Ed.2d 597; 554 F.2d 1353 at 1357.

■ In the case at bar Intervenor claims that her dismissal by the RISD was a racially discriminatory unequal application of the RISD's Policy B–5131, Pupil Discipline and Conduct, Corporal Punishment subsection. In measuring the facts of this case against the above standards, this Court finds that Intervenor's dismissal was an intentional act of racial discrimination violating the Equal Protection Clause.

The historical background of Defendant's actions is to be noted. The School District historically was a dual school system and its desegregation has resulted pursuant to this Court's orders. The Court in *Harkless v. Sweeny Ind. Sch. Dist.,* supra, stated in a similar situation: "Overnight changes in racial attitudes, as we have sadly noted in the last twenty years, are rare. There is little indication that the S.I.S.D. as an institutional whole attained that rarity."

Insofar as the unequal impact of the School District's actions is concerned, the Court finds that similarly situated white teachers were treated unequally in the enforcement of Board Policy B–5131. Intervenor introduced competent evidence that some white teachers and school officials, at Stults Road Elementary or in other schools in the District, improperly administered corporal punishment without being disciplined or terminated from employment.[2] Some of

2. The following testimony was offered by witnesses at trial, and was left unrebutted by competent, credible evidence.

In the school year 1972–1973, Allen Foxall, Jr., a Black junior high school student in the RISD was thrown off the top of a bleacher, twelve to fifteen feet to the ground, by Coach Charles Pickett, a white teacher with the RISD. Mrs. Allen Foxall, Sr., Allen's mother, confronted Coach Pickett concerning the incident, and he admitted throwing Allen off the bleachers. Mrs. Foxall made several requests to speak with Mr. J. J. Pearce, Superintendent of RISD, but was refused an audience. RISD agreed to pay Allen Foxall's doctor bills resulting from the attack by Coach Pickett. The RISD administration knew of the corporal punishment administered by Coach Pickett, but no action was taken against him. There was no evidence that Coach Pickett was placed in a defensive position by the student, Allen Foxall.

In March, 1976, Mrs. Rice, a fifth grade white teacher at Stults Road Elementary School, grabbed Greg McCoy, a Black fifth grade student, by the neck, tearing his shirt and scratching his neck. In April, 1976, Mrs. Rice slapped Greg McCoy on the neck, causing red marks which were visible several hours later. Mrs. McCoy testified that she could see red hand prints on Greg's neck over three hours after Mrs. Rice had slapped him. On neither occasion did Mrs. Rice call Greg's parents or have another teacher or principal present before slapping or scratching him. There was no evidence that Mrs. Rice was placed in a defensive position by the student, Greg McCoy. Mrs. Jerry McCoy, Greg's mother, went to Stults to speak with the principal, Otis Ratliff, who refused to speak with Mrs. McCoy unless Greg and Mrs. Rice were present. The RISD administration knew of the corporal punishment administered by Mrs. Rice, but no investigation was made of the incident between Mrs. Rice and Greg and no action was taken against Mrs. Rice.

In 1976, Paul Kepler, a thirteen year old white student at North Junior High School, was hit with a paddle by Jerry Pittman, a white assistant principal, for calling his teacher a "turkey." As a result of the incident Paul Kepler's buttocks were severely bruised and beaten to such an extent that he could not sit down. (I. Ex. 37–41.) Mr. Ronald Kepler, Paul's father, spoke with Mr. J. J. Pearce, the Superintendent of RISD, and Mr. Charles West, a member of the RISD Board of Trustees, concerning the beating his son received from Jerry Pittman. Mr. J. J. Pearce agreed that Paul had received a beating, not a paddling. Mr. Kepler was told by RISD administrators that it was not easy to fire a teacher and no action was ever taken against Jerry Pittman.

Lisa Bell, a thirteen year old student at Richardson Junior High School, was shoved into a wall by a white principal, Mr. Elmer Wooten, for failing to maintain a straight line to the lunchroom. No other teacher was present when Lisa was shoved, and Lisa's parents were not called prior to or subsequent to the contact. Mrs. Mary Bell, Lisa's mother, complained to RISD officials about the conduct of the principal, but no action was taken against him. The RISD administration knew of the corporal punishment administered by Mr. Wooten, but no action was taken against him. There was no evidence that Mr. Wooten was placed in a defensive position by the student, Lisa Bell.

Several white RISD principals and vice-principals, including Otis Ratliff and Bryce London, have paddled children in violation of RISD Board Policy B–5131 by failing to notify the parents of the children before administering

the incidents attested to were analogous to Intervenor's actions during her confrontation with Seth Dewit. It is clear that in some of the instances higher level school officials were aware or should have been aware of the incidents. As it happens, a major portion of these other instances of improperly administered corporal punishment, introduced into evidence, involved black children. Finally, there was no other instance introduced into evidence where Board Policy B–5131 had been enforced, and a teacher had been either disciplined or terminated as a result of improperly administered corporal punishment.

The *Harkless v. Sweeny* court considered the last four factors mentioned in *Arlington Heights* together under the general rubric of "sequence of events." This Court will follow the same practice.

The RISD asserts that the uncontroverted evidence includes the following: that Seth Dewit did not strike Intervenor, that Intervenor struck Seth at least twice, once in the classroom and again in the doorway; that there was no adult witness present; that Intervenor did not call Seth's parents prior to striking him; and, that Intervenor was aware of the RISD's policy regarding corporal punishment.

However, this skeletal view of the facts leaves out relevant matters. First of all, there is competent evidence that Intervenor's act of striking Seth was done out of a perceived need for self defense and out of a need to protect the test-taking atmosphere of her classroom space. Secondly, there is some background which indicates that Seth had a deep resentment towards Intervenor. Thirdly, there can be no question that Seth Dewit, Dub Edwards and Henry Morales acted aggressively towards Intervenor during the confrontation. Fourthly, it is undisputed that Intervenor did request that Henry Morales go find Seth's teacher, Mrs. Love, for assistance in the matter. It is clear that there were no adults available, and that Intervenor did attempt to obtain adult assistance. Finally, Intervenor's

striking of Seth was of quite limited severity as is indicated by his participation in field day events later in the day of the confrontation.

It is clear that the evaluation of these facts, which were before the School Board, is a duty assigned to school officials and the Board of Trustees. However, when the configuration of facts is scrutinized as a whole, the Court cannot help but detect an arbitrariness and discriminatory conduct on the part of the School District.

This observation becomes clearer as further matters are considered. First of all, the principal, Otis Ratliff, admitted that he did not consider Intervenor's unblemished record over fifteen years of service as a teacher in the School District before recommending Intervenor's termination. Secondly, the principal made up his mind to ask for Intervenor's resignation from RISD employment the day after the event, with a minimum of discussion with Intervenor. Thirdly, Intervenor was never given a chance to either transfer to another school, go through a period of probation or any other less extreme alternative to termination from the School District.

Upon being asked about this, Otis Ratliff indicated that he felt Intervenor by her actions in that one unique event on the last day of school had "flagrantly violated a School District policy" and that he felt that no one was entitled to violate this policy even once. When this attitude is contrasted with the attitude of Seth Dewit's parents who remained neutral throughout all of the proceedings in this case and who never registered a complaint with any School District official, the Court must take note. Furthermore, when Otis Ratliff's seemingly strict view of the enforcement of Board Policy B–5131 in this instance is contrasted with his enforcement of that policy in other instances,[3] this Court is led to only one conclusion: the enforcement of Board Policy B–5131 in this instance was pretextual and a disguise for intentional racial discrimination against Intervenor.

---

corporal punishment and in failing to have another principal or teacher present when administering the punishment.

**3.** See Footnote 2 above.

In conclusion, the Court finds that in terminating Intervenor's contract of employment the RISD violated the Equal Protection Clause by unequally enforcing Board Policy B–5131, and by intentionally discriminating against Intervenor on the basis of race. In addition, the Court finds that the RISD violated Intervenor's right to substantive due process.

Accordingly, Intervenor's attorneys are requested to submit an appropriate judgment whereby Intervenor is ordered reinstated with the Richardson Independent School District and an appropriate amount is set to recompense her for her lost wages based on the stipulated yearly salaries, and qualified by any mitigation achieved through her income during the time since her termination. Intervenor is also granted attorney's fees to compensate her attorneys for their efforts on her behalf.